THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KWANG JUN LEE, ) | |
| ) | |
| Plaintiff, ) | Case No. 16-CV-8610 |
| ) | |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| HANJIN INTERMODAL AMERICA, INC., ) | Magistrate Judge Sidney Schenkier |
| d/b/a HANJIN EXPRESS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiff Kwang Jun ("KJ") Lee[1] worked as a driver at Hanjin Express, a division of Hanjin Intermodal America, Inc., an international shipping company based in Seoul, Korea. He claims that he was denied overtime pay in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat § 105/1 *et seq.*, for work he performed between September 1, 2013, and October 4, 2016. Though KJ Lee reported and was paid for overtime hours during this period, he claims that he worked additional, unreported overtime hours that were not compensated. However, KJ Lee testified that he has no records of how many hours of overtime he allegedly worked, and that his claim is based merely upon his recollection that he occasionally worked "late."

KJ Lee's claims fail, for two reasons. First, he has no evidence creating a just and reasonable inference that he performed unreported overtime work; to the contrary, records that *he created* as part of his daily work contradict his claim. Second, even if he had performed unreported

---

[1]    KJ Lee's former supervisor is named Kevin Lee, so for clarity, they are referred to by their full names of "KJ Lee" and "Kevin Lee" herein.

overtime work, he cannot demonstrate that Hanjin had actual or constructive knowledge of it. Hanjin thus moves for summary judgment.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Hanjin is an international shipping company based in Seoul, Korea, conducting business in the United States, including Chicago. (Def.'s SOF ¶ 1.) Throughout his employment, KJ Lee was one of two employees working at Hanjin's Express warehouse in Chicago. (*Id.* ¶ 7.) KJ Lee worked as a Courier Driver, spending most of his work day picking up customers' packages from several locations around the Chicagoland area. (*Id.* ¶¶ 6, 12.) The other employee, Ha Rim Choi, handled the day-to-day operations of Hanjin Express's delivery service, including collecting delivery documents, and maintaining accounts payable and receivable. (*Id.* ¶ 8.) After KJ Lee completed his route, he would return to the Hanjin warehouse, where Choi would scan and confirm receipt of the items, before sending a confirmation email to headquarters in Korea. (*Id.* ¶ 19.) KJ Lee would then package the items and deliver them to the Korea Air terminal at O'Hare International Airport for shipment to Korea. (*Id.* ¶ 20.) Until December 2013, KJ Lee and Choi both reported directly to Station Manager Jin Sung Park. (*Id.* ¶ 10-11.) In December 2013, Park returned to Korea, and Kevin Lee assumed supervision of Hanjin's Chicago location. (*Id.* ¶ 11.)

Hanjin treated KJ Lee as a salaried, non-exempt employee; he earned a salary based on a forty-hour work week, and he received overtime compensation for any additional hours over 40 that he reported. (*Id.* ¶¶ 57, 60.) To receive compensation for overtime, he would submit an "Overtime Report," reflecting the hours of overtime worked during a given pay period, to his supervisor for approval. (*Id.* ¶ 58.)

Throughout his employment, KJ Lee worked Monday through Friday, with a shortened schedule on Wednesdays, though prior to August 2016, Hanjin did not use any formal timekeeping

system to track KJ Lee's hours. (*Id.* ¶¶ 26-27, 70.) Rather, he self-reported any hours worked over 40 with the "Overtime Report" referenced above. (*Id.* ¶ 58.) However, during this time, KJ Lee maintained daily logs recording pickup locations along his route. (*Id.* ¶¶ 28.) Though these logs do not indicate when KJ Lee began or ended his work day, other records indicate that he concluded his work day between 4:20 and 6:30 p.m., most typically around 5:30 p.m. (*Id.* ¶¶ 29, 50, 53.)

Prior to July 2016, KJ Lee was allowed to take the company car home with him at night; accordingly, he would drive from his house directly to his first pickup location every morning. (*Id.* ¶¶ 13-14, 24.) Sometimes, KJ Lee would stop at a gas station on his way to his first pickup location. (*Id.* ¶ 35.) The closest of these gas stations is a seven-minute drive from KJ Lee's house, and the furthest is an eighteen-minute drive. (*Id.* ¶ 36.) The credit-card receipts indicate that on mornings when KJ Lee filled his car with gas on the way to his route, he typically did so between 8:20 and 9:30 a.m. (*Id.* ¶ 37.)[2]

KJ Lee testified that he would visit between seven and eight pickup locations before lunch every day. Estimated driving times and KJ Lee's testimony indicate that it would take him approximately three and a half hours to complete his morning route. (*Id.* ¶¶ 31, 41.) He would then take a thirty-minute lunch. (*Id.* ¶ 42.) KJ Lee would then visit between two and four pickup locations during the afternoon, before heading back to the warehouse. (*Id.* ¶ 39.) Estimated driving times and KJ Lee's testimony indicate that it would take him, at most, approximately two hours and forty-five minutes to complete his afternoon route. (*Id.* ¶¶ 31, 43.) After returning to Hanjin's warehouse, KJ Lee would spend up to an hour and a half packaging items for shipment to Korea. (*Id.* ¶ 47.) He would then deliver the packages to the Korea Air terminal at O'Hare International

---

[2] After July 2016, KJ Lee would start his day by driving his personal car from his house to Hanjin's facility, arriving between 8:20 and 8:25 am, and then leave with the company car to begin his route. (*Id.* ¶ 33.)

Airport. (*Id.* ¶ 22.) After KJ Lee unloaded the cargo at the Korea Air terminal, he would head home, usually no later than 5:30 p.m. (*Id.* ¶ 53.)

KJ Lee and Hanjin agree that KJ Lee occasionally worked more than forty hours in a given week. KJ Lee requested and received overtime compensation using Hanjin's system many times throughout his employment at Hanjin. (*Id.* ¶¶ 60, 74.) KJ Lee also claims that he worked additional, unreported overtime hours that he was discouraged from reporting (*Id.* ¶¶ 61, 68, 71.) Yet, KJ Lee has no documentation that he worked—or even attempted to report—overtime hours for which he was not compensated. (*Id.* ¶¶ 63-64, 71, 79.) His allegation that he worked unreported overtime hours is based solely on his perception that he "work[ed] a lot of hours," but he does not know how many he worked or have any records of them. (*Id.* ¶ 79.)

## III. ARGUMENT

KJ Lee claims that he worked unreported overtime hours prior to October 4, 2016, for which Hanjin failed to pay him. This claim is baseless, for two reasons. First, KJ Lee has not presented adequate evidence to create an inference that he performed overtime work for which he was not compensated; rather, the Hanjin records (including some that he created) contradict his claim. Second, even if he had worked unreported overtime—which he did not—he has not shown that Hanjin was aware of his alleged overtime.

### A. *KJ Lee Cannot Demonstrate That He Worked Unreported Overtime*

KJ Lee has not produced evidence sufficient to create an inference that he worked *any* unreported overtime. In an action for unpaid overtime wages, the employee has the burden of showing that he performed work for which he was not compensated. *Anderson v. Mt. Clemens Potter Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds as stated in IBP,*

4

*Inc. v. Alvarez*, 546 U.S. 21, 41 (2005)).[3] Where the employer has kept accurate records of the time worked, the employee can easily meet this burden by reference to those records. *Id.* at 687. But where the employer's records are alleged to be inaccurate or incomplete, the employee must "prove[] that he has in fact performed work for which he was improperly compensated [by] produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* If the employee carries this burden, then the burden shifts to the employer to negate the reasonableness of the inference the employee seeks to draw from his evidence. *Id.* at 687-88.

Here, KJ Lee has failed to carry his initial burden of producing evidence creating an inference that he performed unreported overtime. The law requires him to produce evidence from which a reasonable factfinder could determine, or at least reasonably infer, how much money he made, how many hours he worked, and whether he thus received appropriate compensation for those hours. However, beyond the daily logs—which lack any indication of the time KJ Lee began his route, how long he spent at any given location, or when he returned to the Hanjin warehouse–KJ Lee kept no records of how many hours he worked. His only evidence is his own testimony, which is vague, contradictory, and self-serving.

KJ Lee testified that the daily delivery logs that he maintained are the most accurate records of his time, despite that they contain no information whatsoever related to his hours. (Def.'s SOF ¶ 29-30.) Out of the *hundreds* of daily logs that KJ Lee relies on, only *five* contain any estimation of time spent at each delivery location. (*Id.* ¶ 29.) However, even these limited approximations are ultimately useless in constructing KJ Lee's overtime claims, as KJ Lee asserts that the majority of

---

[3] The FLSA and IMWL overtime provisions are "parallel" and follow the "same principles." *E.g., Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010); *Mullins v. Target Corp.*, No. 09 C 7573, 2011 U.S. Dist. LEXIS 39997, at *2-3 n.1 (N.D. Ill. 2011). This Memorandum thus addresses them in tandem.

his uncompensated overtime work consisted of activities that occurred after he returned to the Hanjin warehouse. (*Id.* ¶¶ 45, 72.) In particular, KJ Lee attributes a significant portion of his unreported overtime to a period of a few days between 2014 and 2015 during which Hanjin's scanner was broken, requiring him and Choi to manually input the deliveries into the system. (*Id.* ¶ 72.) Though KJ Lee's pay records indicate that he reported and received five hours of overtime during this period, KJ Lee contends that these records are incomplete. (*Id.* ¶¶ 74-75.) However, KJ Lee cannot provide any evidence, beyond his own testimony, that he worked these alleged additional unreported overtime hours beyond those he reported. (*Id.* ¶ 79.) Ultimately, KJ Lee is not even sure of how many hours of overtime he worked, but did not report while employed by Hanjin. (*Id.*) He merely perceives that he "work[ed] a lot of hours." (*Id.*)

Yet, the records that do exist—KJ Lee's credit-card receipts, Choi's daily emails, and the weighting receipts from the airport, combined with publicly-available information regarding the distances he drove—indicate that KJ Lee did not work more than forty hours a week. For most of the limitations period, KJ Lee drove from his home to his first pickup location each morning. (*Id.* ¶¶ 32.) Under the law, his compensable work hours for the day would begin when he arrived at this first location. 29 CFR §§ 785.35 (time spent travelling from home to the day's first worksite is not compensable), 785.38. Based on KJ Lee's credit-card receipts from mornings when he filled his car with gas on the way to his first pickup location, his typical workday did not begin until sometime after 8:20 a.m at the earliest, and sometime after 9:30 a.m. at the latest. (Def.'s SOF ¶¶ 35, 37.) After spending about three and a half hours on his morning stops, he would then take a thirty-minute lunch break, and depart for his afternoon route, which would take about two hours and forty-five minutes. (*Id.* ¶¶ 31, 41, 42, 43.) KJ Lee then spent no more than an hour and a half packaging items for shipment to Korea. (*Id.* ¶ 47.) He would then deliver the packages to the Korea

Air terminal at O'Hare International Airport. (*Id.* ¶ 22.) After KJ Lee unloaded the cargo at the Korea Air terminal, he would head home, usually no later than 5:30 p.m. (*Id.* ¶ 53.)

Thus, records show that KJ Lee worked from 8:30 a.m. to 5:30 p.m. on Mondays, Tuesdays, Thursdays, and Fridays, with a half-hour lunch. Even this calculation is generous to him, as it ignores the days when he started his day at 9:30 a.m. or later. (*Id.* ¶¶ 36-37.) On Wednesdays, KJ Lee worked a half day. (*Id.* ¶ 27.) Thus, the record shows that for most of the limitations period, KJ Lee worked no more than thirty-eight hours per week.

In August 2016, Hanjin changed its company car-policy, and KJ Lee was required to return the car to the Hanjin warehouse after delivering the packages to the airport. (*Id.* ¶ 51.) However, by KJ Lee's own admission, this change in policy did not increase his hours of work. (*Id.*) Indeed, the records from this period support this; the weighing receipts show that on average, KJ Lee left the airport at 5:30 p.m., meaning he would be done working upon returning to Hanjin's warehouse by 5:40 p.m. (*Id.* ¶¶ 53-55.) At most this added forty minutes to KJ Lee's weekly hours, keeping his weekly total below forty hours a week.

In contrast to these records, KJ Lee has no evidence creating a "just and reasonable inference" that he performed any unreported overtime. When asked how he knows that he worked more overtime than he was paid and is reflected in Hanjin's payroll records, he simply replied, "I know that I work[ed] a lot of hours, but I don't have anything in record." (*Id.* ¶ 79.) He also testified to working hours that are impossible based on clear documentary evidence; for example, he testified that it usually took him 35 to 40 minutes to complete what should be a 12-minute drive, and that he usually left the airport at 7:00 p.m. when records show him usually leaving between 4:20 and 5:30 p.m. (*Id.* ¶¶ 48-50, 52.) This is insufficient to defeat summary judgment. The Seventh Circuit disposed of a similar claim in *Turner v. The Saloon, Ltd.*, 595 F.3d 679 (7th Cir.

7

2010). There, the plaintiff claimed that he was forced to alter his time records to underreport his hours worked, but the employer introduced records contradicting this assertion. *Id.* at 690. The court affirmed summary judgment, noting that "this claim is flimsy in the extreme" and holding that "[a]lthough Turner disputes the accuracy of The Saloon's records, his mere assertions are insufficient to create a jury issue." *Id.* at 691. The Court should reach the same result here, as KJ Lee has nothing more than "mere assertions" to combat his inability to identify how many overtime hours he worked. *See also Vince v. Ill. Cent. Sch. Bus, LLC*, No. 09 C 5360, 2011 U.S. Dist. LEXIS 12858, at *32-38 (N.D. Ill. February 9, 2011) (granting summary judgment where employee relied only on vague testimony about off-the-clock hours, unsupported by any records, correspondence, or allegation that employer's records were inaccurate).

### B. *Hanjin Did Not Know KJ Lee was Performing Unreported Overtime*

Even assuming that KJ Lee had evidence that he performed unreported overtime, his claim still fails because he cannot show that his supervisor, Kevin Lee, was aware that he was working overtime hours in addition to those he reported and received compensation for. KJ Lee must show that Hanjin had actual or constructive knowledge that he worked overtime without compensation because "the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (citing 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."); 29 C.F.R. § 785.11 (Time compensable only where "[t]he employer knows or has reason to believe that [the employee] is continuing to work")).

In the occasional weeks when KJ Lee worked more than 40 hours and reported those hours, Hanjin properly paid him overtime for those hours. (Def.'s SOF ¶ 60.) It therefore defies explanation why KJ Lee would fail to report additional overtime hours. Judge Milton I. Shadur

8

granted summary judgment on a similar claim in *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F. Supp. 2d 837 (N.D. Ill. 1998). There, the employee kept his own time records, and regularly submitted and was paid for overtime hours, but later claimed that he actually continued working later than the ending times he recorded and was owed more overtime for those hours. *Id.* at 839. The court was troubled that the employee's claim of off-the-clock work was "wholly dependent on his own deposition testimony" and was "totally at odds with" his prior conduct, given that he "submitted detailed and extensive requests for overtime . . . throughout his entire tenure" with the company and was paid for all overtime he requested. *Id.* at 840-41. The court held that this contradiction was analogous to a plaintiff who tries to dodge summary judgment by submitting a dubious affidavit contradicting his deposition testimony, and that his "post hoc deposition testimony, which is directly at war with his own actual conduct and recordkeeping," would not enable a reasonable factfinder to believe that he worked more hours than he recorded. *Id.* at 841-42. The Court should hold the same here, where KJ Lee's claim is similarly supported only by his "self-contradictory testimony," *id.* at 841, particularly his fuzzy and subjective belief that he just knows he "work[ed] a lot of hours." (Def.'s SOF ¶ 79.)

*Bjornson* also points to a second reason why Lee's claim fails: because he has no evidence that Hanjin was aware of any unreported overtime. An employer can be liable for unpaid overtime only if it had "actual or constructive knowledge" that the employee performed unpaid work. *Bjornson*, 12 F. Supp. 2d at 842; 29 C.F.R. § 785.11. KJ Lee claims that, to the extent he did not report his alleged overtime hours, it was because his former supervisor, Park, discouraged him from doing so in a single conversation sometime in or before 2013.[4] (Def.'s SOF ¶ 61, 67.) KJ Lee also testified that Choi allegedly advised him to underreport his overtime hours in 2014, and that

---

4   The record is unclear whether this conversation took place within the limitations period.

9

he never mentioned the alleged unreported overtime again because his "pride was hurt." (*Id.* ¶ 68.) However, KJ Lee's hurt pride does not excuse him from providing Hanjin with notice of his alleged unpaid overtime. "The subjective belief that a further complaint about not being paid…would fall on deaf ears has no bearing on whether [the plaintiff] could have complained about the alleged unpaid overtime at issue in th[e] case." *Allen v. City of Chicago*, No. 10 C 3183, 2015 U.S. Dist. LEXIS 165906, *54 (N.D. Ill. Dec. 10, 2015) (citing *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 862 (N.D. Ill. 2015) (granting defendant summary judgment on issue of whether defendant had constructive or actual knowledge the plaintiff was not being paid for overtime)).

Here, it is undisputed that after his alleged conversation with Choi in 2014, KJ Lee never told anyone of this alleged unpaid work, and no one at Hanjin, including Choi or his supervisor Kevin Lee, knew of it. (Defs.' SOF ¶¶ 63-66, 69.) For at least two years, KJ Lee did not inform anyone at Hanjin that he was allegedly performing unreported overtime hours without compensation. (*Id.* ¶ 68.) In doing so, KJ Lee failed to put Hanjin on notice, thus depriving it of the opportunity to comply with the FLSA and IMWL. *See Kellar*, 664 F.3d at 178 ("By failing to record their hours accurately and failing to tell their supervisors or managers about the [unpaid, off-duty work], plaintiffs prevented defendants from having actual knowledge of their off the clock work.")

KJ Lee has no evidence that anyone in the company's management knew or should have known about the alleged unpaid work, and his claim fails for this reason also. *Bjornson*, 12 F. Supp. 2d at 842-43; *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (affirming summary judgment where employee did not mention unpaid overtime to anyone, was paid all overtime he reported, and had no evidence the company knew of any unpaid hours). KJ Lee never provided actual notice by complaining to his supervisor, Kevin Lee, about any of the

10

unpaid overtime he now claims he worked. (*Id.* ¶¶ 63-66.) KJ Lee claims that he complained to Ms. Choi about Hanjin's alleged unspoken practice of underreporting overtime in 2014. (*Id.* ¶ 68). However, Choi was not KJ Lee's supervisor, and there is no evidence suggesting that these alleged complaints placed Hanjin management on notice about KJ Lee's unpaid overtime. (*Id.* ¶¶ 67, 78.) Nor is there any evidence that Choi knew KJ Lee was actually working any overtime hours at any point. (*Id.* ¶ 69.) The Court should grant summary judgment because the FLSA does not extend liability to employers who lacked actual or constructive knowledge of the alleged violations. *Kellar*, 664 F.3d at 169.

## IV. CONCLUSION

KJ Lee cannot offer any evidence that he worked overtime hours for which he was not paid. Nor can he demonstrate that Hanjin had constructive or actual knowledge that he worked unreported overtime. Accordingly, the Court should grant summary judgment to Hanjin.

Dated: March 19, 2019         **HANJIN INTERMODAL AMERICA, INC.,
                               d/b/a HANJIN EXPRESS**


                              By:   /s/ Neil H. Dishman
                                    One of Its Attorneys

Neil H. Dishman
Brenna R. McLean
Jackson Lewis P.C.
150 N. Michigan Ave., Suite 2500
Chicago, IL 60601
T: (312) 787-4949
Neil.dishman@jacksonlewis.com
Brenna.mclean@jacksonlewis.com

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on March 19, 2019, he caused a true and correct copy of the foregoing *Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment* to be filed with the Court by electronic filing protocols, and that same will be electronically served upon all attorneys of record registered with the Court's ECF/CM system, including:

> Ryan J. Kim
> Inseed Law P.C.
> 2454 E. Dempster Street, Suite 301
> Des Plaines, IL 60016

By: /s/ Neil H. Dishman