UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KWANG JUN LEE,<br><br>    Plaintiff,<br><br>    v.<br><br>HANJIN INTERMODAL AMERICA, INC., d/b/a HANJIN EXPRESS,<br><br>    Defendant. | Case No. 16-cv-08610<br><br>Judge Martha M. Pacold |

**MEMORANDUM OPINION AND ORDER**

    This case involves a dispute about a package delivery driver's overtime wages. Plaintiff Kwang Jun Lee sued his employer, Hanjin Intermodal America, Inc., d/b/a Hanjin Express (Hanjin) alleging violations of the Fair Labor Standards Act (FLSA) and Illinois Minimum Wage Law (IMWL). Hanjin now moves for summary judgment on both claims. For the reasons stated below, Hanjin's motion [60] is denied.

**Background**

    In deciding Hanjin's motion for summary judgment, the court views the evidence in the light most favorable to Lee. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are undisputed unless otherwise noted. Hanjin is a Korea-based shipping company that does business in the United States, including Chicago. Hanjin's Statement of Facts, [61] ¶ 1.[1] Between June 2011 and December 2014, Hanjin's Chicago offices were located at the Korean Air terminal of O'Hare Airport. [61] ¶ 3. Hanjin relocated its Chicago Freight Forwarding and Express divisions to a warehouse in Wood Dale, Illinois in December 2014, and relocated them again to another warehouse in Mount Prospect, Illinois in February 2016. [61] ¶¶ 4, 5.

    Lee started working for Hanjin in Chicago as a Courier Driver for the Hanjin Express division in October 2011. [61] ¶ 6. While he worked there, Lee was one of

---

[1] Bracketed numbers refer to docket entries and are followed by page or paragraph numbers. Page numbers refer to the CM/ECF page number.

two employees at the Chicago location. [61] ¶ 7. The other employee, Ha Rim Choi, handled the day-to-day operations of Hanjin Express in Chicago. [61] ¶ 8. Between 2011 and December 2013, Lee and Choi reported to Jin Sung Park, the Chicago Branch Manager. [61] ¶ 10. In December 2013, Kevin Lee replaced Park in that role. [61] ¶ 11.

The parties agree on Lee's duties and an outline of his typical workday. Lee picked up packages from Hanjin's customers, delivered them to Hanjin's warehouse, and readied them for shipment to Korea. During the first five years of his employment, Lee began his day by driving a company car from his home to his first pickup location. [61] ¶¶ 13–14, 16. He picked up packages during the morning and afternoon. When he returned and unloaded the packages at the warehouse, Choi scanned them and emailed a receipt to Hanjin's headquarters. After that, Lee readied the packages for shipment to Korea. Once Hanjin relocated from O'Hare to the Wood Dale warehouse, Lee was additionally responsible for transporting the items from Wood Dale to O'Hare for shipment at the end of each day. [61] ¶¶ 19–20, 22.

Lee worked Monday through Friday, but on Wednesday Hanjin did not run its express services and therefore Lee did not have to prepare and deliver a shipment to the airport. [61] ¶¶ 26–27; Lee's Response to Hanjin's Statement of Facts, [69] ¶ 27.

In July or August of 2016, Hanjin purchased a new company vehicle, and Lee was required to drop it off at Hanjin's offices when he finished working. Accordingly, he then started his day by driving to the offices to retrieve the company car, rather than driving directly from his home to his first pickup location. [61] ¶¶ 24–25; [69] ¶ 24.

In September 2016, Lee brought this action to recover allegedly unpaid overtime wages under the FLSA and the IMWL beginning December 1, 2011. [1].

Hanjin seeks summary judgment on Lee's claims in their entirety, arguing that Lee has not proved either that he worked unpaid overtime (at all or with sufficient specificity) or that Hanjin knew about any such work.

## Discussion

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation and footnote omitted). Construing the evidence and facts supported by the record in favor of the nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

I. **Uncompensated Overtime**

Lee claims that he was not properly paid for overtime work in violation of the FLSA and the IMWL. Hanjin first argues that Lee cannot show that he worked uncompensated overtime at all or with sufficient specificity. The parties agree that Lee performed some overtime work, but Hanjin argues that Lee requested payment and was paid for the overtime.

The FLSA provides as relevant: "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Thus, the FLSA requires an employer to pay overtime "at a rate not less than one and one-half times" the employee's regular hourly wage for every hour worked in excess of forty in a workweek. *Id.*; *see DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 735 F.3d 568, 570 (7th Cir. 2013); *Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 756 (7th Cir. 2013). The IMWL requires the same. 820 ILCS 105/4a; *Garcia v. Draw Enterprises III, LLC*, No. 17-cv-4477, 2018 WL 6045206, at *4 (N.D. Ill. Nov. 19, 2018) (citing cases). Since neither party argues that the analysis for the IMWL overtime claim diverges from the FLSA standard, the court evaluates the claims together.

"[A]n employee who brings suit pursuant to FLSA 'has the burden of proving that he performed work for which he was not properly compensated.'" *Melton v. Tippecanoe Cty.*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by* Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251–62).

"Where the employee alleges that his employer kept inaccurate records, he 'has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'"

3

*Melton*, 838 F.3d at 818 (quoting *Anderson*, 328 U.S. at 687); *see also Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 595 (7th Cir. 2008); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010); *Lee v. BK Schaumburg Inc.*, No. 18-cv-3593, 2020 WL 3577994, at *5 (N.D. Ill. July 1, 2020); *Garcia*, 2018 WL 6045206, at *6; *Meadows v. NCR Corp.*, No. 16-cv-6221, 2017 WL 5192009, at *9 (N.D. Ill. Nov. 9, 2017). "At that point, '[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Melton*, 838 F.3d at 818 (quoting *Anderson*, 328 U.S. at 687–88); *see also Brown*, 534 F.3d at 595. "If the employer fails to meet that burden, a court may award damages even though they are approximations." *Brown*, 534 F.3d at 595.

    A.    **Payroll Records**

As mentioned, Lee must first prove (or, at the summary judgment stage, identify a genuine issue of material fact) that he performed overtime work for which he was not properly compensated. The parties agree that Lee performed some overtime work, but Hanjin argues that Lee requested payment and was paid for the overtime. Lee claims that Hanjin's payroll records inaccurately recorded the hours he worked because his supervisors discouraged him from submitting requests for overtime.

"The FLSA makes clear that employers, not employees, bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by employees. . . . Thus, if plaintiffs have evidence sufficient to support a finding that they were told not to record all their overtime, [defendant] cannot hide behind a policy of having employees keep their own time to avoid compensating the employees for all overtime hours worked, including unrecorded hours." *Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1071–72 (N.D. Ill. 2005) (citations omitted); *see also Blakes v. Illinois Bell Tel. Co.*, 75 F. Supp. 3d 792, 814 (N.D. Ill. 2014) (if plaintiff's supervisors "discouraged him from accurately recording his overtime, such actions indicate that [defendant's] records cannot be trusted, at least with regard to [plaintiff]") (citing *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007)). Therefore, the relevant question at this step of the analysis is whether a reasonable factfinder could find that Hanjin discouraged Lee from reporting his overtime, thereby calling into question whether Hanjin's records reflect all of Lee's overtime.

Hanjin's recordkeeping and payroll procedures are not in dispute. Hanjin paid Lee a weekly salary for forty hours of work per week. [69] ¶ 57. Lee could also submit to his supervisor an "overtime report" detailing any additional overtime hours worked in a pay period. [69] ¶¶ 57–58. Before August 2016, Hanjin did not use a formal timekeeping system to track Lee's hours; rather, he self-reported overtime with the overtime report. [69] ¶¶ 58, 70; [62] at 2–3. In accordance with these procedures, Hanjin paid Lee for overtime work at various points in the

relevant period. [69] ¶ 60. However, Lee claims that he also worked overtime hours that he did not submit in an overtime report and for which he was not paid.

Lee has provided evidence that at least one of his supervisors discouraged him from submitting overtime, thereby creating a fact issue as to the accuracy of Hanjin's records. Specifically, Lee testified that his former supervisor, Park, told Lee in 2013 to underreport his overtime hours. [69] ¶¶ 61, 67. Lee testified that Choi also encouraged Lee to underreport his overtime twice, once in late 2014 and again in early 2015. [69] ¶ 75; [70-1] at 527–28. Park's successor, Kevin Lee, never himself encouraged underreporting, and there is no evidence Kevin Lee knew that Park, Choi, or anyone did so. [61] ¶¶ 65–66.

The parties disagree about whether Choi was Lee's supervisor rather than colleague. If Choi was Lee's supervisor, and if a jury were to credit Lee's testimony that Choi discouraged Lee from reporting overtime, that would create a fact issue about the accuracy of Hanjin's records. *See Blakes*, 75 F. Supp. 3d at 814. Lee testified that he submitted his overtime forms directly to Choi, who was responsible for approving the request before forwarding it to Kevin Lee. [69] ¶ 59. As Hanjin points out, Kevin Lee testified that Choi and Lee were "equals." [61] ¶ 78. But an October 4, 2016 letter from Hanjin's HR manager to Lee referred to Choi as Lee's supervisor, and instructed Lee to have his overtime requests "signed either by Ms. Choi or Mr. [Kevin] Lee." [69] ¶ 78. Considering this conflicting evidence, there is a material dispute of fact with respect to whether Choi was Lee's supervisor.

Hanjin argues that Lee could not have been deterred from reporting overtime since it is undisputed that Lee *did* report and Hanjin *did* pay him for overtime work. Hanjin cites *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F. Supp. 2d 837, 840–41 (N.D. Ill. 1998). There, the court held that the plaintiff's testimony about overtime work was "flatly belied" by the fact that the plaintiff had submitted "detailed and extensive" requests totaling "694 hours of overtime," all of which were honored. *Id.*

*Bjornson*, however, is distinguishable. While Lee submitted overtime requests that were honored, his testimony that he underreported hours is nonetheless plausible. Unlike *Bjornson*, Hanjin has not shown that Lee's requests were so extensive or detailed that they could not have understated the truth. Lee contends based on earnings statements that Hanjin paid Lee 5 hours of overtime in 2015, [69] ¶ 74; [68-1] at 18–41.[2] Given Lee's testimony that both Park and Choi encouraged him to underreport his overtime, *see* [61] ¶¶ 61, 75, a reasonable factfinder could decide that Lee reported some but not all his overtime work and

---

[2] Lee does not always provide appropriate record citations in responding to Hanjin's Statement of Facts. [69] ¶ 74. Generally, the court cannot independently review the extensive record to locate missing record citations, but the court has done so in this instance.

5

that Hanjin's records did not reflect all of Lee's overtime work. *Garcia*, 2018 WL 6045206, at *6 ("That [defendant] never altered [plaintiff's] time records or rejected an overtime request does not eliminate the effect of its discouragement against claiming overtime or its awareness that she was working overtime.").

Because a reasonable factfinder could decide that Hanjin's records did not reflect all of Lee's overtime work, Lee is only required to "produce sufficient evidence to show the amount and extent of [overtime] work as a matter of just and reasonable inference." *Turner*, 595 F.3d at 691 (quoting *Anderson*, 328 U.S. at 687).

### B.   Amount and Extent of Overtime Work

Lee still must "produce sufficient evidence to show the amount and extent of" any unpaid overtime work "as a matter of just and reasonable inference." *Melton*, 838 F.3d at 818 (quoting *Anderson*, 328 U.S. at 687). At the summary judgment stage, the question is whether a reasonable factfinder could find in Lee's favor under this standard. Hanjin argues that Lee cannot satisfy the "just and reasonable inference" standard, since Lee's only evidence of unreported overtime is his "self-serving" testimony. [62] at 5. But the Seventh Circuit has emphasized that the term "self-serving" may not "be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). Lee may appropriately rely on his own deposition testimony to identify a material factual dispute as to how much compensable overtime he worked. *See Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 815 (N.D. Ill. 2011) ("[T]he cases are uniform in holding that an employee may satisfy his burden of proof under the Act by relying on his recollection alone.").

The Seventh Circuit has held that plaintiffs may use "triggering factors" to help them recall when they worked overtime. *See Brown*, 534 F.3d at 597–98 (citing *Allen*, 495 F.3d at 1317); *see also Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (noting that an employee could reconstruct unreported time "from memory, inferred from the particulars of the jobs the [employee] did, or estimated in other ways"). Plaintiffs may also rely on approximations. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 364 (2d Cir. 2011) (holding that an employee's declaration estimating that he performed an average of "one to five hours of uncompensated overtime each week," even if not "precise," provided sufficient proof of damages). However, a plaintiff may not rely on speculation alone. *See Brown*, 246 F. Supp. 3d at 1220 (explaining that "[b]are allegations" and "vague undocumented estimates" do not survive summary judgment).

Lee's testimony satisfies the "just and reasonable" standard for purposes of summary judgment. Lee testified that in 2013, he would typically start his morning route around 8:00 a.m. and would work continuously until around noon or 1:00 p.m. [69] ¶ 41. He would sometimes take a thirty-minute lunch break, but other times

6

would instead eat in the car. [69] ¶ 42. After lunch, he would continue to pick up items until 5:00 or 6:00 p.m., when he returned to the warehouse. [69] ¶ 43. The parties agree that after Lee returned from his afternoon route, Choi would send a manifest email to Hanjin's headquarters. [61] ¶ 44. Lee would scan, weigh, and pack the items. [69] ¶ 45. Lee testified that in 2013, his average workday would end around 7:00 p.m. on Monday, Tuesday, Thursday, and Friday. [70-1] at 420. Lee testified that on Wednesday, his job duties varied, and he worked for eight hours, at least at times (as discussed in the footnote, there is a dispute as to how much Lee worked on Wednesdays in 2013 or at other times). [70-1] at 422–23.[3]

Lee testified that in 2014 and 2015, his schedule was roughly the same as in 2013. [70-1] at 442, 470. In July 2014, Lee began driving to Naperville twice a week. On these days, he would leave his home earlier. [70-1] at 453, 471. When Hanjin relocated its office to Wood Dale, Lee had the additional duty of driving packages from the Wood Dale location to the airport. Lee testified that this drive would take thirty to forty minutes. [61] ¶ 48. When he left the airport, he received a timestamped weighing check report. [61] ¶ 46. Lee also testified that toward the end of 2014, the computer or scanner broke down. [70-1] at 527. The system was broken from late October 2014 until March 2015. During this time, Lee and Choi would work late entering information by hand, sometimes for 12 or 13 hours, such that Lee arrived home at 9:00 p.m. at the latest. [70-1] at 476–77. Lee would typically leave the office to go to the airport around 7:00 p.m. during that time. [70-1] at 527.

During the second half of 2015 and 2016, Lee's work hours began to decrease. [70-1] at 478. In July of 2016, he stopped driving to Naperville. [70-1] at 478. After Hanjin got the new company car (in July or August of 2016 as noted above), he would drive from the airport to Hanjin's office before returning home. He testified that starting in August 2016, he would typically return to Hanjin's headquarters at 7:00 p.m. [61] ¶ 52. Around then, Hanjin started occasionally using a third-party truck to deliver shipments to O'Hare. On days when this occurred, Lee's day ended

---

[3] There is a dispute as to how much Lee worked on Wednesdays in 2013 or at other times, *see* [69] ¶ 27, and whether at least some of Lee's daily logs indicate the hours Lee worked, *see* [69] ¶ 29. Lee's testimony on how much he worked on Wednesdays is at times unclear. *See* [70-1] at 409, 422–23, 444–45, 473–75. But in the end, the testimony is enough to raise fact issues as to how much Lee worked on Wednesdays in different years and whether the hours he worked on Wednesdays (along with the hours he worked the rest of the week) exceeded 40.

Whether a reasonable factfinder would have a basis in the record for a just and reasonable inference as to the amount is a closer call due to the lack of precision of Lee's testimony. But given that at summary judgment the record must be viewed in the light most favorable to the nonmovant, that the employer bears responsibility for keeping accurate records, and that in the absence of those records Lee's testimony would allow some general estimates, summary judgment is not warranted.

earlier. [61] ¶ 54. After Hanjin moved to the current Mount Prospect location (in February 2016 as noted above), Lee testified, it would take him twenty-five minutes to drive from there to the airport. [61] ¶¶ 55–56.

In sum, a reasonable factfinder could conclude, if it credited Lee's testimony, that for several years, Lee worked on average from 8 a.m. to 7 p.m. four days a week, and at times up to eight hours on the fifth day. While compensable work hours begin at the first work location, *see* 29 CFR § 785.35 ("An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime."), and Lee would often take a half-hour lunch break, these hours add up to an average of over forty hours a week during weeks in which Lee received no overtime pay. Lee's testimony is enough to raise "a genuine issue of fact as to whether [plaintiff] was not properly paid overtime in violation of the FLSA." *Brown*, 534 F.3d at 596–97. It is also enough to allow a reasonable factfinder to conclude that Lee has shown the amount of unpaid overtime as a matter of just and reasonable inference. *Id.* at 597 (noting that records of when the business was open, along with the employee's testimony about her typical after-hours duties, formed a satisfactory "basis for arriving at a just and reasonable inference as to the uncompensated hours"); *see also Garcia*, 2018 WL 6045206, at *6–7; *Meadows*, 2017 WL 5192009, at *9–10 & n.20.

Nevertheless, Hanjin argues that summary judgment is appropriate because Lee does not know precisely how many uncompensated overtime hours he worked. As Hanjin points out, Lee testified that "I know that I work[ed] a lot of hours, but I don't have anything in record." [61] ¶ 79. But again, it is the employer's burden to keep accurate records; and the cases Hanjin cites to support this assertion involve speculative and conclusory claims that lack the foundational testimony that Lee has provided.

In *Turner*, 595 F.3d at 691, the plaintiff did not produce any evidence at all showing how much overtime pay he was denied. Instead, he merely argued that his employer's records were inaccurate. *Id.* at 690–91 & n.8. In *Vince v. Illinois Cent. Sch. Bus, LLC,* No. 09-cv-05360, 2011 WL 578832, at *13 (N.D. Ill. Feb. 9, 2011), the plaintiff testified to working 84-hour work weeks for which she was not paid overtime. But there, the plaintiff did not allege or argue that the defendant's records—which contradicted her account—were inaccurate. Moreover, the plaintiff also failed to specify the timeframe in which she worked 84-hour work weeks. The court observed: "In 2007, did Plaintiff work these hours until January, or until March? The Court has no way to determine this. Throwing darts at a calendar would seemingly provide as reliable a time period for this work as would discerning these dates from Plaintiff's evidence." *Id.* The court thus granted summary judgment to the defendant, holding that despite the plaintiff's conclusory testimony

8

alleging unpaid overtime, there was "no reasonable way to determine the amount and extent of the work Plaintiff performed." *Id.*

In *Gatto v. Mortg. Specialists of Illinois, Inc.*, 442 F. Supp. 2d 529 (N.D. Ill. 2006), the court held that the plaintiff's statement asserting "without specificity that she worked more than 40 hours per week 'nearly every week'" was not, by itself, sufficient to create a genuine issue of material fact. *Id.* at 536. In reaching that conclusion, the court relied on *Haywood v. North Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997), for the proposition that "conclusory allegations and self-serving affidavits, if not supported by evidence in the record, will not preclude summary judgment." *Id.* As noted above, the Seventh Circuit has emphasized that at summary judgment, courts must consider "self-serving" evidence that is otherwise admissible. *Hill*, 724 F.3d at 967. And in any event, the *Gatto* plaintiff did not offer specific testimony about his tasks and how long they took at different points in time. In this case, Lee has laid a proper factual foundation for his estimates about average work hours during different periods of time. Thus, Lee has provided enough specificity to survive summary judgment.

However, Hanjin also argues that Lee's testimony is controverted by available records. As the Seventh Circuit has explained, "[r]elying on the employee's recollection is permissible given the unlikelihood that an employee would keep his own records of his work hours. . . . But relying on recollection does not mean the plaintiff may survive summary judgment where his recollection is flatly refuted by other evidence in the record, . . . or his story is so internally inconsistent or implausible on its face that no reasonable person would believe it." *Melton*, 838 F.3d at 819 (citations and internal quotation marks omitted).

Hanjin points to two sources of evidence that it suggests "flatly refute" Lee's testimony regarding overtime hours worked: (1) credit card receipts and weighing check reports, and (2) Google Maps. Lee responds with two additional sources of evidence that he suggests corroborate his testimony: I-Pass records, and personal calendars and delivery logs. On reply, Hanjin argues that the I-Pass records also refute Lee's testimony. Because the court does not think that any of Hanjin's evidence makes Lee's story so "implausible on its face that no reasonable person would believe it," summary judgment is inappropriate. *Id.*

### 1. Credit Card Receipts and Weighing Check Reports

First, Hanjin uses credit card receipts and timestamped weighing check reports to argue that Lee's typical day was no more than 9 hours. Hanjin points out, and Lee does not dispute, that Lee's credit card receipts show that on days when he filled his car with gas on the way to his first pickup, his workday started sometime after the time shown on the credit card receipts, which are timestamped between 8:20 a.m. and 9:30 a.m. [61] ¶¶ 35, 37. Hanjin relies on timestamped weighing check reports, which Lee testified indicate the time he left the airport at

9

the end of his day, [61] ¶ 46, to argue that Lee's day typically ended no later than 5:30 p.m. Hanjin argues that "[t]hus, records show that KJ Lee worked from 8:30 a.m. to 5:30 p.m. on Mondays, Tuesdays, Thursdays, and Fridays, with a half-hour lunch. Even this calculation is generous to him, as it ignores the days when he started his day at 9:30 a.m. or later. . . . On Wednesdays, KJ Lee worked a half day. . . . Thus, the record shows that for most of the limitations period, KJ Lee worked no more than thirty-eight hours per week." [62] at 7 (citations omitted).

In response, Lee points out that the forty weight receipts attached to Hanjin's motion are from 2016. He argues that 2016 is not a representative year, since he allegedly worked fewer hours that year. [70-1] at 478. He also argues that most of the "air waybills" from before 2016 do not have the timestamped report attached, and attaches one receipt from 2014 showing that he left the airport at 8:10 p.m. [68-1] at 78.

The 2016 weight stamps do somewhat undermine Lee's testimony that he "usually" left the airport at 7:00 p.m. in 2016, although some of the stamps are consistent with that timeframe. Nevertheless, Hanjin has only attached a small number of receipts from a single year. Hanjin explains that it has receipts "for most of 2016," and that it "has provided a representative sample" "in the interest of brevity," [61] at 8 n.3; but this implies that it lacks receipts for much of the time period at issue here (beginning December 1, 2011). A reasonable factfinder could decide that the 2016 receipts do not undermine Lee's general testimony about his work hours.

### 2. Google Maps

Hanjin also relies on Google Maps estimates of driving time between various locations to argue that some of Lee's driving time estimates are impossible.[4] For example, Lee testified that it usually took him 35 to 40 minutes to drive from the Wood Dale location to the airport. [61] ¶ 48. Hanjin attaches a Google Maps estimate showing that this drive only takes 17 minutes. [61] ¶ 49; [63-1] at 301. After Hanjin moved to the current Mount Prospect location, Lee testified that it would take him 25 minutes to drive from there to the airport. [61] ¶ 56. Hanjin again attaches a Google Maps estimate showing that this drive takes approximately 10 minutes. [61] ¶ 55.

Lee argues that Irving Park Road was closed to traffic for construction during this time, forcing him to take a detour. Lee relies on an affidavit (submitted along

---

[4] The court can take judicial notice of locations, approximate distances, and transit times from Google Maps. See *Moore v. Magiera Diesel Injection Serv., Inc.*, No. 18-cv-03762, 2019 WL 2502029, *3 (N.D. Ill. June 17, 2019); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enter.*, 834 F.3d 760 (7th Cir. 2016).

10

with his response to Hanjin's summary judgment motion) and an Illinois Department of Transportation bulletin to support this claim. [69] ¶ 49; [68-2] ¶ 20. However, at his deposition, Lee testified that he "would take Irving Park" and "make a left on Mannheim." [70-1] at 440–41. The Seventh Circuit has been "highly critical of efforts to patch up a party's deposition with his own subsequent affidavit. . . . Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants . . . . Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) (citations omitted); *see also James v. Hale*, 959 F.3d 307, 316, 2020 WL 2487603, at *5 (7th Cir. May 14, 2020) ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."); *Brown*, 534 F.3d at 598. Here, Lee's affidavit is somewhat corroborated by the attached IDOT bulletins, suggesting that Lee's earlier testimony could have been mistaken. But the court does not need to resolve the tension between Lee's deposition testimony and affidavit, because even without the Irving Park closure, the lengths of these drives are disputed facts. A reasonable factfinder could credit Lee's recollection that these drives took substantially longer than Hanjin's Google Maps estimates. Lee argues, for example, that these estimates do not account for rush-hour traffic. Lee has not testified to drive lengths that are impossible as a matter of law.

### 3. I-Pass Records

For his part, Lee argues that several pieces of evidence corroborate his testimony that he worked uncompensated overtime. First, he attaches I-Pass records that show him passing tolls at O'Hare West and Touhy Avenue. *See generally* [70]. Lee also presents a summary chart of the I-Pass records to show a list of numerous days in 2014 when he was on the highway for over eight hours. [68-1] at 42–45. Lee argues that actual work hours on these days would have been even greater, since he would have done a variety of work tasks after passing through the toll plaza at the end of the day. Pay records show that Hanjin did not pay him for any overtime work on these days, or any days between February 14, 2014, and December 31, 2014. [68-1] at 47–48.

Hanjin argues that the I-Pass records fail to support Lee's claim for several reasons. First, it argues that Lee drove the company car for personal as well as company use. [61] ¶ 15. But this is disputed, since Lee testified that he did not. [70-1] at 437. Second, Hanjin argues that since Lee testified to starting his day around 8:00 a.m., he cannot rely on records that show him starting his day earlier in the morning. But this is an oversimplification of Lee's testimony, since Lee only testified to his average start time, and testified to starting earlier on days where he drove to Naperville. [70-1] at 453, 471.

11

However, Hanjin also makes arguments that could successfully undermine the value of the I-Pass records, if credited by a factfinder. First, Lee's compensable work hours begin at his first work location. *See* 29 CFR § 785.35 (time spent traveling from home to the day's first worksite is not compensable). If he passed the first toll on the way to his first location, this time would not be an accurate indicator of his starting time for pay purposes. As to the end of the day, Lee testified that he did not drive through any tolls on his way from Hanjin's office to O'Hare International Airport but did on his way home from work. [70-1] at 437, 440. Logically, this means he passed the last toll after finishing work, undermining his argument that he worked additional hours after passing through the toll. Finally, while Lee has pointed to individual days in which more than eight hours passed between the toll charges, Hanjin points out on reply that even assuming that the I-Pass records accurately reflect the number of hours Lee worked on those particular days, the records for those particular workweeks do not show any *weeks* in which the hours based on I-Pass records add up to more than forty hours. [71] at 6 & n.3; *see DeKeyser*, 735 F.3d at 570 (overtime pay required for hours worked "beyond forty hours in one work week").

Ultimately, these arguments go to the weight of the I-Pass records. Lee does not rely solely on these records to defeat summary judgment. Nor does Lee argue that the I-Pass records standing alone account for all hours worked each and every day. As a result, even though Hanjin effectively pokes holes in some of Lee's testimony, the evidence provided is not enough to conclude that Lee's story is so "implausible on its face that no reasonable person would believe it." *Melton*, 838 F.3d at 819 (citation and internal quotation marks omitted).

### 4. Personal Calendars and Delivery Logs

Finally, Lee argues that his personal calendars and Hanjin's delivery logs corroborate his testimony regarding overtime worked. Lee testified that he marked his personal calendars with a symbol on days when he worked "longer hours, like 12 to 13 hours." [70-1] at 548. While this notation did not indicate the precise hours that he worked, Lee testified that it serves as a general reminder "of the long hours that [he] worked." [70-1] at 548–49. Similarly, Lee points to Hanjin's daily delivery logs on which Lee recorded the pickup locations he visited. According to Hanjin, many of the logs do not record time spent at each location. [61] ¶¶ 28–29; [63-1] (attaching some logs). Lee contends that in 2016 he began to annotate the logs with more timing details, [69] ¶ 29, but cites a substantial page range of Bates-stamped documents without indicating where in the voluminous record those documents appear or whether some of them appear in the logs Hanjin attached, [63-1]. Nonetheless, even without timing details, the logs provide evidence of the work Lee did.

Hanjin argues that the calendar notations constitute the type of "bare allegations" and "vague undocumented estimates" that other courts have held do

12

not preclude summary judgment. [71] at 6–7 (citing cases, including *Melton*, 838 F.3d 814; *Brand v. Comcast Corporation*, 135 F. Supp. 3d 713, 742 (N.D. Ill. 2015); *Golden v. World Sec. Agency, Inc.*, 884 F. Supp. 2d 675, 700–01 (N.D. Ill. 2012); *Gatto*, 442 F. Supp. 2d at 535–36). But in those cases, the plaintiffs relied solely on sources that lacked explanations, memory "triggering factors," or foundational testimony. Here, Lee has provided enough testimony about his work hours to create a triable fact issue about his unpaid overtime hours. The calendars and the logs add additional detail.

## II. Knowledge

Next, Hanjin argues that even if Lee worked additional overtime for which he was not compensated, Hanjin did not have actual or constructive knowledge of that work.

Under the FLSA, "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g). The regulations explain that "[w]ork not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift. . . . The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time." 29 C.F.R. § 785.11. "The rule is also applicable to work performed away from the premises or the job site . . . . If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked." § 785.12. "In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." § 785.13.

Section 203(g)'s "broad definition . . . helps prevent evasion by employers who might seek to issue formal written policies limiting overtime that are widely violated, or who might deliberately close their eyes to overtime work their employees are doing." *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017); *see also Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). "If the employer does not want to pay overtime, its management must 'exercise its control and see that the work is not performed.'" *Allen*, 865 F.3d at 938 (quoting § 785.13). "Employers must, as a result, pay for all work they know about, even if they did not ask for the work, even if they did not want the work done, and even if they had a rule against doing the work." *Allen*, 865 F.3d at 938.

"That strict rule has a limit, however. It stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Id.* (citations and internal quotation marks omitted).

13

> "The employer's knowledge can be either actual or constructive. . . . An employer has constructive knowledge of an employee's work if it should have acquired knowledge of that work through reasonable diligence." *Id.* (citations omitted). Whether an employer has exercised "reasonable diligence" is a fact-specific inquiry. *Id.* at 943.

> "One way an employer can exercise diligence is by establishing a reasonable process for an employee to report uncompensated work time." *Id.* at 938–39. "But an employer's formal policy or process for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting in practice." *Id.* at 939.

Lee has provided adequate evidence of constructive knowledge. As discussed above, Lee testified that his former supervisor, Park, told him to underreport his overtime hours. [61] ¶ 61; [70-1] at 516, 525. Lee testified that Choi also encouraged Lee to underreport his overtime. [61] ¶ 75; [70-1] at 526–33. A reasonable factfinder could determine that a supervisor who discourages an employee from reporting overtime has reason to know that employee is in fact working overtime, constituting constructive knowledge. *Garcia*, 2018 WL 6045206, at *5–6; *Meadows*, 2017 WL 5192009, at *9.

Moreover, if a supervisor (whether Park or Choi) had constructive knowledge of Lee's overtime work, this knowledge may be imputed to Hanjin. *See Skelton*, 382 F. Supp. 2d at 1073; *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00-cv-5755, 2004 WL 1882449, at *4 (N.D. Ill. Aug. 18, 2004) ("Knowledge of a supervisor is imputed to the employer, and it is sufficient that a manager or supervisor, acting with reasonable diligence, had the opportunity to acquire the knowledge.").

As discussed above, there is a material dispute of fact as to whether Choi was Lee's supervisor. Lee gave his overtime requests to Choi instead of sending them to Kevin Lee directly. [69] ¶ 59. Lee's affidavit states that Choi "almost always ignored" his requests for overtime and "did not provide the form for [him] to submit." [68-2] at 2. Even setting aside the postdeposition affidavit, Lee offers the October 4, 2016 letter from Hanjin's HR manager to Lee, which referred to Choi as Lee's supervisor, and instructed Lee to have his overtime requests "signed either by Ms. Choi or Mr. [Kevin] Lee." [69] ¶ 78. While there is conflicting testimony regarding whether Choi could approve or disapprove Lee's requests, *see* [68-2] at 2; [61] ¶ 59, the court will not weigh this evidence at summary judgment. The current record would allow a reasonable factfinder to decide that Choi encouraged Lee to underreport his hours and / or oversaw approval of the forms. Finally, even if a reasonable factfinder concluded that Choi was not Lee's supervisor and could not approve the forms, the factfinder could credit Lee's testimony with respect to Park. Thus, there is a dispute about whether Hanjin had constructive knowledge of Lee's overtime work, making summary judgment inappropriate.

14

Hanjin also argues that after the 2014 conversation in which Choi discouraged Lee from reporting overtime, no one at Hanjin, including Choi or Kevin Lee, knew whether Lee actually worked any uncompensated overtime. [61] ¶¶ 63–66, 69. This argument does not warrant summary judgment. Contrary to Hanjin's assertion, Lee testified that Choi discouraged him from reporting overtime twice, in late 2014 and early 2015. [70-1] at 528. Choi also worked directly with Lee throughout the relevant period. Since Lee testified that they worked late together during several periods, and that she knew when he was leaving for the airport, the current record contains a basis for a reasonable factfinder to decide that she had actual knowledge of his overtime work.

Hanjin relies again on *Bjornson*, here to refute the allegation of Choi's actual knowledge. In that case, however, the court noted that plaintiff's supervisor observed the plaintiff "playing computer games and doing personal work on his computer after hours," and did not confirm that he ever saw or knew that the plaintiff was working for the defendant when he stayed late. *Bjornson*, 12 F. Supp. 2d at 842. In this case, Hanjin has not argued that Lee ever stayed late at work to conduct personal activities. Thus, *Bjornson* is not comparable.

In sum, Lee has produced enough evidence that Hanjin had actual or constructive knowledge of his unpaid overtime work to survive Hanjin's motion for summary judgment.

## Conclusion

The motion for summary judgment [60] is denied.

Date: February 12, 2021                /s/ Martha M. Pacold